TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
LYNDSI ALLSOP (Cal. Bar No. 323485)
Assistant United States Attorney
General Crimes Section
        1200 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-3165
        Facsimile: (213) 894-0141
        E-mail:    Lyndsi.Allsop@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:21-00239-DSF-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT BRIAN BENSON |
| v. | Hearing Date: November 1, 2021 |
| BRIAN BENSON, | Hearing Time: 8:30 a.m. |
| Defendant. | Location:    Courtroom of the Hon. Dale S. Fischer |

        Plaintiff United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California and Assistant United States Attorney Lyndsi Allsop,
hereby files its Sentencing Position Regarding Defendant Brian
Benson.

//

//

//

//

//

//

1    This Position is based upon the attached Memorandum of Points
2 and Authorities, the Declaration of Lyndsi Allsop and Exhibit A
3 attached thereto, the files and records in this case, the Presentence
4 Investigation Report (Dkt. No. 45) and sentencing recommendation
5 letter (Dkt. No. 44) prepared by the United States Probation and
6 Pretrial Services Office, and such further evidence and argument as
7 the Court may wish to consider at the time of sentencing.

8  Dated: October 18, 2021        Respectfully submitted,

9                                 TRACY L. WILKISON
                                  Acting United States Attorney
10
                                  SCOTT M. GARRINGER
11                                Assistant United States Attorney
                                  Chief, Criminal Division
12

13                                      /s/
                                  _____
14                                LYNDSI ALLSOP
                                  Assistant United States Attorney
15
                                  Attorneys for Plaintiff
16                                UNITED STATES OF AMERICA

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant BRIAN BENSON and co-defendant Marlon Moody conspired to use their jobs as cargo handlers to steal $224,000 worth of gold bars stored at Los Angeles International Airport ("LAX").  Defendant pleaded guilty to conspiracy to commit theft of an interstate or foreign shipment, in violation of 18 U.S.C. § 371.  (Dkt. No. 41.)

The government agrees with the United States Probation and Pretrial Services Office (the "USPPSO") that defendant's total offense level under the Guidelines is 13, his criminal history category is I, and his Guidelines sentencing range is 12 to 18 months' imprisonment.  The government disagrees, however, with the USPPPSO's recommendation of three years' probation and 100 hours' community service (Dkt. No. 44 ("Sent. Rec. Ltr.") at 1).  As detailed below, in light of defendant's abuse of his position and brazen theft of nearly a quarter million dollars, the government recommends a low-end Guidelines sentence of 12 months' imprisonment, one year of supervised release, and a mandatory special assessment of $100.

## II.  STATEMENT OF FACTS

Defendants conspired with each other and others to steal four gold bars valued at approximately $56,000 each.  (Dkt. No. 32 ("Plea Agr.") at 23.)  The gold bars were part of a 2,000-gold-bar shipment Brink's Global Services USA, Inc. ("Brink's") sent from Australia to New York.  (Id. at 19.)  At the time of the gold shipment, defendants were employed by Alliance Ground International ("AGI"), a company that provided ground handling at LAX.  (Id.)  As part of their duties

1  at AGI, defendants offloaded cargo from aircrafts at LAX and had
2  access to certain sections of the airport.  (Id.)

3      On the date of the theft, defendants exchanged text messages
4  about the Brink's gold bar shipment stored in an LAX warehouse.
5  During the exchange, defendant wrote, "That's big lol" and "I need to
6  take a closer look."  (Declaration of Lyndsi Allsop ("Allsop Decl."),
7  Ex. A (Text Messages) at 1.)  Co-defendant Moody later wrote, "I
8  found it", "I could not get all", and "It said brinks on it".  (Id.)
9  Defendant replied, "Where at . . I need to get 1."  (Id. at 2.)  Co-
10 defendant Moody then told defendant to go get additional gold bars,
11 and defendant asked if the box was open.  (Id.)  Co-defendant Moody
12 confirmed the box was open and described its location.  (Id.)

13     To effectuate the theft, co-defendant Moody placed a box
14 containing 25 gold bars on a vehicle used for offloading aircraft
15 cargo (the "belt loader") and parked the belt loader near a
16 warehouse.  (Plea Agr. 19-20.)  Co-defendant Moody removed four gold
17 bars from the shipment and hid them on his person.  (Id. at 21.)
18 Defendant ultimately did not retrieve any additional gold bars.  (Id.
19 at 22.)  Following the theft, defendant picked co-defendant Moody up
20 at the belt loader in an AGI van and drove him to another warehouse
21 at LAX.  (Id.)  Defendants met for several minutes inside the
22 warehouse and then left LAX together on foot.  (Id.)  Once defendants
23 exited LAX, co-defendant Moody gave defendant one gold bar.  (Id.)
24 That same day, they exchanged text messages about the gold bars and
25 pawn shops in the Los Angeles Area.  (Id.)

26     Days after the theft, co-defendant Moody gave one gold bar to
27 his cousin (J.S.) and told him to exchange the gold bar for a vehicle
28 and/or money.  (Id. at 23.)  Co-defendant Moody buried two gold bars

in his backyard and defendant hid one gold bar in his bedroom.  (See id.)

Co-defendant Moody later confessed to the FBI that he took the four gold bars, and said he buried two gold bars in his backyard, gave one gold bar to defendant, and gave another gold bar to J.S. (Allsop Decl. ¶ 2.)  In the presence of FBI agents, co-defendant Moody informed defendant that he had confessed to taking the gold bars and encouraged defendant to also tell the truth.  (Id.)  After this call, defendant admitted that he received a gold bar from co-defendant Moody.  (Id.)  Defendants and J.S. then turned all four gold bars over to agents.  (Id.)

## III.  USPPSO CALCULATIONS AND SENTENCING RECOMMENDATION

The USPPSO determined that defendant's base offense level is six, pursuant to U.S.S.G. § 2X1.1(a), (c); 2B1.1(a).  (Dkt. No. 45 ("PSR") ¶¶ 3, 35.)  Pursuant to U.S.S.G. § 2B1.1(b)(1)(F), the USPPSO applied a 10-level increase because the intended loss amount exceeded $150,000.  (Id. ¶¶ 3, 36.)  The USPPSO applied a two-level increase because the offense involved goods or chattels from a cargo shipment, pursuant to U.S.S.G. § 2B1.1(b)(15)(B).  (Id. ¶¶ 3, 37.)  The USPPSO also determined that defendant was a minor role participant and applied a two-level decrease, pursuant to U.S.S.G. § 3B1.2(b).  (Id. ¶ 39.)  After a three-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), the USPPSO calculated a total offense level of 13.  (Id. ¶¶ 45-47.)

Defendant has no convictions and has one pending traffic case from 2008.  (Id. ¶¶ 49-57.)  The USPPSO accordingly found that defendant has zero criminal history points, placing him in Criminal History Category I.  (Id. ¶¶ 53-54.)  Based on a total offense level

3

of 13 and a criminal history category of I, defendant's Sentencing Guidelines range is 12 to 18 months' imprisonment and one to three years' supervised release.  (Id. ¶¶ 92, 95.)

The government agrees with all of the USPPSO's calculations except, as discussed below, its application of a two-level decrease for a minor role adjustment.  Instead, the government recommends a two-level downward variance due to defendant's early acceptance of responsibility during the COVID-19 pandemic, which would yield the same total offense level of 13.  (Plea Agr. ¶ 5).

**IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The government recommends that the Court impose a 12-month term of imprisonment followed by a one-year term of supervised release, and a $100 special assessment.[1]  This sentence is "sufficient, but not greater than necessary," to address defendant's criminal conduct, taking into account all the factors the Court must consider under 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3553(a).  Such a sentence justly balances the seriousness of the offense and the need for the kind of

---

[1] The fine range for this offense is $5,500 to $55,000.  (PSR ¶ 101, U.S.S.G. § 5E1.2(c)(3).)  Per the USPPSO, defendant does not have the ability to pay the fine.  (PSR ¶ 88.)  Thus, the government agrees with the USPPSO that the Court should waive the fine.  (Sent. Rec. Ltr. at 1, U.S.S.G. § 5E1.2(a).)  Also, the government submits that there is no restitution in this case.  (See PSR ¶¶ 103-104.)  Because defendants returned the gold bars, there is no actual loss. United States v. Carter, 742 F.3d 440, 447 (9th Cir. 2014) ("An item returned is no longer a loss as of the day it lands in the victim's hands . . .").  And, although Brink's incurred additional insurance costs during the pendency of this case, these expenses were not directly caused by either damage to or the loss or destruction of the gold bars and thus, they are consequential losses, which are not compensable as restitution.  United States v. Sablan, 92 F.3d 865, 870 (9th Cir. 1996) ("restitution can only include losses directly resulting from a defendant's offense"; holding consequential expenses were improperly included in the district court's restitution order).

4

1  sentence imposed against the history and characteristics of defendant

2  in light of both the mitigating and aggravating factors.  See id.

3  **A. A MITIGATING ROLE ADJUSTMENT IS INAPPROPRIATE**

4  Defendant is a 36-year-old man who made the decision to

5  actively participate in a conspiracy to steal gold from a

6  transnational shipment.  He should not be granted minor participant

7  status.  "Even if a defendant is less culpable than his co-

8  participant[] . . . he is not automatically entitled to a reduction

9  for minor participant status."  United States v. Benitez, 34 F.3d

10  1489, 1498 (9th Cir. 1994) (citation omitted).  Rather, a mitigating

11  role adjustment is appropriate only where a defendant was

12  "substantially less culpable than the average participant in the

13  criminal activity."  U.S.S.G. § 3B1.2, comment.(n.3(A)) (emphasis

14  added).  The determination whether to apply a mitigating role

15  adjustment is fact-based and depends on the totality of the

16  circumstances.  U.S.S.G. § 3B1.2, comment.(n.3(C)).  Courts should

17  consider the following non-exhaustive list of factors when

18  determining whether a mitigating role adjustment applies: (1) the

19  defendant's understanding of the scope and structure of the crime;

20  (2) the defendant's participation in planning and organizing the

21  crime; (3) the defendant's exercise of decision-making authority

22  and/or influence over decision-making authority; (4) the nature and

23  extent of the defendant's participating in the crime, including "the

24  acts defendant performed and the responsibility and discretion the

25  defendant had in performing those acts"; and (5) the defendant's

26  potential benefits from the crime.  Id.

27  Four of the five enumerated factors weigh against granting

28  defendant a mitigating role adjustment.  First, defendant understood

5

the scope and nature of the theft. After co-defendant Moody informed him that he found the gold, defendant replied, "Where at . . I need to get 1." (Ex. A at 1.) Defendant's text messages show he was acutely aware co-defendant Moody intended to steal gold bars, and further points to defendant's desire to acquire gold for himself. Second, defendant appears to have had advance knowledge of the plan to steal gold from the Brink's shipment. On the date of the theft, co-defendant Moody texted defendant, "I found it" and shortly thereafter, explained that he "could not get all". (Id. at 1-2.) Notably, defendant did not ask what his co-defendant found, which evidences that he already knew co-defendant Moody was referring to the gold bars. Instead, he replied that he "need[ed] to get 1" and asked if the container was still open. (Id. at 2.) To be sure, defendant ultimately did not personally retrieve a gold bar himself (Plea Agr. at 22) but he did actively participate: he wrote to co-defendant Moody that he needed to get one gold bar, and co-defendant Moody retrieved the gold bar for him (see Ex. A at 1, Plea Agr. at 22). Collectively, these facts suggest defendant actively participated in the plan to steal at least one gold bar from the shipment. Third, the extent of defendant's decision-making authority is unclear and, therefore, neither weighs for nor against a mitigating role adjustment. Fourth, defendant played a crucial role in the theft. He picked co-defendant Moody up from the belt loader where co-defendant Moody had placed the gold shipment and then took him to another location. (Plea Agr. at 22.) He also accepted a gold bar from co-defendant Moody knowing it was stolen. (See id.) These facts illustrate defendant was an active, willing, and knowing participant in the conspiracy to steal the gold bars. Fifth,

1    defendant stood to gain $56,000 by selling the gold bar.  (Plea Agr.

2    19, 23.)   Indeed, defendants exchanged text messages about pawn shops

3    in the Los Angeles area.  (Id. at 22.)

4         The fact that defendant may not have had decision-making

5    authority and did not take the gold bars himself does not

6    automatically make him a minor participant.  See United States v.

7    Peters, 962 F.2d 1410, 1415 (9th Cir. 1992) (woman who participated

8    in fraud scheme planned by her husband was not entitled to minor or

9    minimal participant status).  Defendant drove co-defendant Moody away

10   from the scene of the theft, accepted a $56,000 gold bar from him,

11   and contemplated exchanging the gold bar for cash.  See id.

12   (financial benefit and knowledge of crime weighed against mitigating

13   role adjustment).  On balance, the facts of this case strongly weigh

14   against applying a minor role adjustment.  United States v. Pinkney,

15   15 F.3d 825, 828 (9th Cir. 1994) (holding district court did not err

16   in declining to apply mitigating role adjustment for a defendant who,

17   in furtherance of a conspiracy to rob mail carriers, drove the robber

18   to and from the scene, cashed the stolen checks, and expected a share

19   of the loot).  Accordingly, this Court should not apply one.

20        B.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

21        Defendant conspired to steal $224,000 worth of gold and accepted

22   $56,000 worth for himself.  (Plea Agr. at 19, 23; PSR ¶¶ 14, 25.)

23   Whether defendant engaged in theft out of greed, grief over the

24   passing of his grandmother (see PSR ¶¶ 29(b), 66(a)), or because

25   "times [were] hard"[2] (Id. ¶ 29(a)), he participated in a brazen theft

26

27

28        [2] Notably, at the time of the theft, defendant was employed by
     AIG and made $20 an hour. (PSR ¶ 78.)  He was also employed by Amazon
     and made $18.65 an hour.  (Id. ¶ 77.)

                                        7

of nearly a quarter million dollars' worth of gold, injured a victim (Brink's), and betrayed the position of trust he held as an AGI employee.  As an AGI employee, defendant was entrusted with handling cargo shipments at LAX and granted access to certain sections of the airport.  (Plea Agr. at 19.)  Defendant squandered that trust by stealing from those who relied on him to handle their property.

Although this was a one-time event, and was perhaps even the result of a momentary lapse in judgment, the offense conduct here was serious, and a sentence of 12 months' imprisonment and one year's supervised release are appropriate.

## C.   HISTORY AND CHARACTERISTICS OF DEFENDANT

Defendant's history and characteristics present both mitigating and aggravating factors.  First, in mitigation, defendant accepted responsibility and pleaded guilty, which allowed the case to be resolved efficiently and saved the government and the Court valuable resources during a pandemic.  Second, defendant's criminal history score is zero.  (PSR ¶¶ 53-54.)  Third, defendant has a stable and continuous history of employment, which indicates he has a lower-than-average risk of reoffending.  (See id. ¶¶ 77-81.)  Fourth, defendant enjoys a strong relationship with and is a source of support for his family.  (See id. ¶¶ 59-69.)  These family ties will help him remain on a law-abiding track.  Fifth, defendant has already faced, and will continue to face, serious consequences for his actions; he lost his job and has a felony conviction on his record for the rest of his life.

Nonetheless, despite defendant's stable employment and family support, he chose to abuse his position of trust and participate in this crime.  Furthermore, though he ultimately accepted

8

responsibility, when confronted by FBI agents, he initially

repeatedly lied, denying he was involved in the theft until co-

defendant Moody convinced him to admit the truth.  (Allsop Decl. ¶ 2,

PSR ¶ 29(a).)  Thus, on balance, defendant's history and

characteristics counsel in favor of a low-end Guidelines sentence of

12 months' imprisonment.

       **D.  NEED FOR SENTENCE IMPOSED TO PROMOTE RESPECT FOR THE LAW, AFFORD ADEQUATE DETERRENCE, PROVIDE JUST PUNISHMENT FOR THE OFFENSE, PROTECT THE PUBLIC, AND AVOID SENTENCING DISPARITIES**

    Given defendant's abuse of his position of trust and

participation in the theft of gold worth $224,000, the government

submits that a 12-month term of imprisonment is necessary to promote

respect for the law and afford adequate deterrence, provide just

punishment, and protect the public.  Because it is within the

Guidelines range, a 12-month sentence will also prevent unwarranted

sentencing disparities between similarly situated defendants.  See

United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010),

overruled on other grounds by United States v. Miller, 953 F.3d 1095

(9th Cir. 2020) ("Because the Guidelines range was correctly

calculated, the district court was entitled to rely on the Guidelines

range in determining that there was no 'unwarranted disparity[.]'").

**V.  CONCLUSION**

    For the foregoing reasons, the government respectfully requests

that the Court sentence defendant to a 12-month term of imprisonment

followed by a one-year period of supervised release with the

conditions recommended by the USPPSO, and a special assessment of

$100.